Citation Nr: 1205194 
Decision Date: 02/10/12 Archive Date: 02/23/12

DOCKET NO. 10-20 847 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in St. Paul, Minnesota


THE ISSUE

Entitlement to service connection for the cause of the Veteran's death.


REPRESENTATION

Appellant represented by: Veterans of Foreign Wars of the United States


WITNESS AT HEARING ON APPEAL

Appellant and son



ATTORNEY FOR THE BOARD

F. Yankey, Counsel


INTRODUCTION

The Veteran served on active duty from February 1967 to December 1968. He died in March 2009, and the Appellant is his surviving spouse.

This case comes before the Board of Veterans' Appeals (Board) on appeal of an October 2008 rating decision of the Department of Veterans Affairs (VA) Regional Office (RO) in St. Paul, Minnesota.

The Appellant testified before the undersigned at a May 2011 Video Conference hearing. The hearing transcript is of record. 


FINDINGS OF FACT

1. The Veteran died in March 2009 as the result of metastatic melanoma.

2. The Veteran's metastatic melanoma originated as a result of exposure to sunlight during active duty in Vietnam.


CONCLUSION OF LAW

The criteria for service connection for the cause of the Veteran's death have been met. 38 U.S.C.A. § 1310 (West 2002 & Supp. 2011); 38 C.F.R. § 3.312 (2011).

REASONS AND BASES FOR FINDINGS AND CONCLUSION

In the current appeal, the Board has considered whether VA has fulfilled its notification and assistance requirements, found at 38 U.S.C.A. §§ 5100, 5102, 5103, 5103A, 5107, 5126 and 38 C.F.R. §§ 3.102, 3.156(a), 3.159, 3.326(a). Given the Board's fully favorable disposition of the matter on appeal, no further notification or assistance in developing the facts pertinent to this limited matter is required at this time. Indeed, any such action would result only in delay.

Legal Criteria

Dependency and Indemnity Compensation (DIC) benefits are payable to the surviving spouse of a Veteran if the Veteran died from a service-connected disability. 38 U.S.C.A. § 1310 (West 2002); 38 C.F.R. § 3.5 (2011).

The death of a Veteran will be considered as having been due to a service-connected disability when the evidence establishes that such disability was either the principal or a contributory cause of death. The issue involved will be determined by exercise of sound judgment, without recourse to speculation, after a careful analysis has been made of all the facts and circumstances surrounding the death of the Veteran, including, particularly, autopsy reports. 38 C.F.R. § 3.312(a) (2011).

The service-connected disability will be considered as the principal (primary) cause of death when such disability, singly or jointly with some other condition, was the immediate or underlying cause of death or was etiologically related thereto. 38 C.F.R. § 3.312(b) (2011).
A contributory cause of death is inherently one not related to the principal cause. In determining whether the service-connected disability contributed to death, it must be shown that it contributed substantially or materially; that it combined to cause death; that it aided or lent assistance to the production of death. It is not sufficient to show that it casually shared in producing death, but rather it must be shown that there was a causal connection. 38 C.F.R. § 3.312(c)(1) (2011); see also Gabrielson v. Brown, 7 Vet. App. 36, 39 (1994).

Service connection may be granted for disability resulting from disease or injury incurred in or aggravated by active military service. 38 U.S.C.A. 1110 (West 2002); 38 C.F.R. § 3.303 (2011). Service connection may be granted for any disease initially diagnosed after service, when all the evidence, including that pertinent to service, establishes that the disease was incurred in service. 38 C.F.R. § 3.303(d) (2011).

Direct service connection may not be granted without medical evidence of a current disability, medical or, in certain circumstances, lay evidence of in-service incurrence or aggravation of a disease or injury; and medical evidence of a nexus between the claimed in-service disease or injury and the present disease or injury. See Caluza v. Brown, 7 Vet. App. 498, 506 (1995) aff'd, 78 F.3d 604 (Fed. Cir. 1996) (table).

38 U.S.C.A. § 1116(a) (West 2002) provides presumptive service connection on the basis of herbicide exposure for specified diseases manifested to a degree of 10 percent within a specified period in a Veteran who, during active military, naval, or air service, served in the Republic of Vietnam during the period beginning on January 9, 1962, and ending on May 7, 1975. It also provides presumptive service connection on the basis of herbicide exposure for each additional disease that the Secretary determines in regulations prescribed under this section warrants a presumption of service-connection by reason of having a positive association with exposure to an herbicide agent, and that becomes manifest within the period (if any) prescribed in such regulations in a Veteran who, during active military, naval, or air service, served in the Republic of Vietnam during the period beginning on January 9, 1962, and ending on May 7, 1975.

Whenever the Secretary determines, on the basis of sound medical and scientific evidence, that a positive association exists between (A) the exposure of humans to an herbicide agent, and (B) the occurrence of a disease in humans, the Secretary shall prescribe regulations providing that a presumption of service connection is warranted for that disease for the purposes of this section. 38 U.S.C.A. § 1116(b)(1).

Analysis

The death certificate indicates that the cause of the Veteran's death in March 2009 was metastatic melanoma. At the time of the Veteran's death, he was service-connected for diabetes mellitus (DM), Type 2, tinnitus and bilateral hearing loss.

The Appellant contends that the Veteran's exposure to Agent Orange during active duty in Vietnam, caused him to develop DM, which caused his death. In the alternative, she contends that the Veteran's service-connected DM, which suppressed his immune system, made him more susceptible to acquiring metastatic melanoma, which eventually led to his death. The Appellant also argues that excessive sun exposure during active duty in Vietnam led to the Veteran's later development of the fatal metastatic melanoma, which caused his death. See May 2011 Video Conference hearing transcript.

The Veteran's DD-214 shows that he served as an Infantry Unit Commander in Vietnam. He received the National Defense Service Medal, Combat Infantryman Badge, Vietnam Service Medal, Vietnam Campaign Medal, and the Bronze Star Medal with "V". Because the record contains a favorable medical opinion upon which direct service connection for the Veteran's fatal metastatic melanoma may be granted, as discussed below, the Board need not address whether the Veteran meets the criteria for presumption of exposure to herbicides contained in 38 U.S.C.A. § 1116. The Board does note, however, that melanoma is not among the diseases associated with exposure to certain herbicide agents at 38 C.F.R. § 3.309(e).

Concerning whether service connection is warranted on a direct basis for metastatic melanoma, the Board notes that the Veteran's service treatment records are negative for any evidence of complaints or treatment for melanoma during service. As noted above, the Veteran was discharged from service in December 1968. The post-service medical evidence of record shows that in July 2008, the Veteran was seen by his primary care physician for evaluation of a changing, bleeding mole on his back. The Veteran reported at that time that he had had a flat brown, asymptomatic mole on his back for 30-35 years, which was never a problem until 2-3 weeks before his appointment, when it "popped out" and started to bleed. He claimed that he had the mole looked at was encouraged to see a dermatologist. The Veteran reported that he had not had an excessive amount of sun exposure in his lifetime, and that he fished often at his cabin, but he always wore a shirt and sunscreen. 

On physical examination, the examiner noted that the Veteran was somewhat tan throughout. On the right mid to upper back was a 5cm x 2cm irregularly shaped, dark brown patch. Towards the superior pole of the lesion was a 1cm red-brown, somewhat glistening nodule with some superficial ulceration on the surface. Otherwise, the Veteran had about 100 2-5mm uniform brown macules, some of which were dark. In his assessment, the examiner noted that the right upper back lesion was very concerning for melanoma, and that it appeared that the Veteran had a superficial spreading melanoma, which more recently converted to a nodular melanoma. He was scheduled for an excision that day. Results revealed a 7mm thickness nodular melanoma, without satellite lesion, with ulceration, Clark Level 5, perineural invasion, and extensive ulceration. On follow-up a few days later, it was noted that a consult had been placed with general surgery for a wide reexcision and sentinel node biopsy, as he was at higher risk for regional and distant metastatic disease. A full skin examination and full lymph node examination was performed. No lymphadenopathy was detected on clinical examination.

In August 2008, he underwent a sentinel lymph node biopsy, which revealed +1/5 on the right and 0/2 on the left, which meant no evidence of metastasis histologically, but positive immunihistochemistry for isolated tumor cells on the left. He then underwent right axillary lymph node resection later that month, with results showing negative 0/30.

Notes from later in August 2008 indicate that the Veteran was counseled on the natural course of his recently diagnosed metastatic melanoma and the high risk for reoccurrence, given that his melanoma was stage IIIB. The Veteran reported at that time that prior to his diagnosis, he had been feeling very well, with no night sweats, no weight loss, no bone complaints and no neurologic complaints. He reported that he had the mole on his back for years and it never changed. In September 2008, the Veteran started Interferon treatment.

Positron emission tomography(PET)/ computerized tomography(CT) scans in January 2009 that showed areas of possible metastatic disease in the bones. He also had an abdominal CT scan later in January 2009, which was negative. He was asymptomatic at that time, so it was decided to monitor him clinically and radiologically, and to consider chemotherapy with dacarbazine/temozolomide or carbo/taxol. 

In February 2009, the Veteran had discontinued his Interferon treatment, due to persistent cytopenias. He complained at that time of fevers several times a day for several weeks, weight loss, weakness, fatigue, abdominal bloating and right upper quadrant pain. He was admitted to evaluate the cause of his fevers. Notes during his inpatient stay indicate that his disease had progressed significantly in the past month, and as that there was no apparent infection to explain the fever, it was possibly tumor-related.

An ultrasound of the abdomen in February 2009 showed multiple masses throughout the liver and spleen, which were noted to require further evaluation for metastatic disease. A CT scan conducted a day later showed interval development of a large destructive lytic lesion in the left posterior fourth rib, consistent with metastatic disease, and interval development of ill-defined hypoenhancing masses in the spleen, likely metastatic deposits. The notes indicate that his disease had clearly progressed and it was clear that the underlying cancer was "pretty fast growing." It was also noted that most of his systemic symptoms, including his fevers, were most likely related to the malignancy as well. He was given the option of starting on chemotherapy with Temozolamide, and it was recommended that he have a bone scan to fully evaluate the extent of his bony metastasis. 

Later in February 2009, the Veteran elected to start chemotherapy with dacarbazine. The VA physician informed the Veteran and his family of the poor prognosis for metastatic disease, given the fact that the melanoma is relatively chemoresistant. The Veteran's health continued to decline in February 2009, and he was assessed for home care needs and given information on hospice services for future planning.

At the beginning of March 2009, the Veteran was discharged from the VA hospital and transferred to the New Brighton Health and Rehabilitation Center (New Brighton) for hospice care. Notes from New Brighton indicate that the Veteran was admitted for comfort care only, and that he would not be receiving further chemotherapy. The Veteran died eight days later.

Lay statements submitted by servicemen who served in Vietnam with the Veteran indicate that they, along with the Veteran were exposed to intense heat and excessive amounts of sunlight on a daily basis, without shirts, while serving in Vietnam. The record also contains numerous photographs of the Veteran and his platoon, working in intense sunlight with minimal amounts of clothing on, and definitely without shirts. See July 2011 statements from JM and SG, and color photographs. 

The Appellant also submitted statements indicating that the Veteran told her that he was forced to work in intense sunlight without a shirt while on active duty in Vietnam. She also reported that she noticed that the Veteran's moles on his back increased and grew together after he returned from Vietnam. See Appellant's May 2009, July 2009, June 2010 and May 2011 statements. The Appellant and the Veteran's son also both testified during the May 2011 Video Conference hearing that the Veteran avoided the sun whenever possible, and that he always covered up so as not to expose his skin to the sun. See May 2011 Video Conference hearing transcript.

In an August 2011 report, Dr. WG, D.O., who conducted an independent medical evaluation of the Veteran's claims file, opined that the Veteran "developed and died from malignant melanoma, more likely than not, as a direct result of his forced exposure to highly deleterious levels of sunlight while on duty in Vietnam." He also opined that the Veteran's exposure to Agent Orange also contributed to the development of his melanoma.

In rendering this opinion, he noted that the Veteran's risk factors for melanoma included intense sun exposure, the presence of moles, and certain gene changes, more likely than not due to exposure to Agent Orange, a known carcinogen and mutagenic substance. He noted further that although military researchers had announced in January 2004, that Vietnam veterans exposed to Agent Orange had a higher than average risk of developing melanoma; the number one causative factor in the development of melanoma is universally accepted as intense exposure to the sun, regardless of the presence of Agent Orange. The examiner also noted that the Veteran did not have any of the other known risk factors for melanoma, such as fair skin that doesn't tan and tends to sunburn or freckle (he had dark skin), history of blistering sunburns at any time of life, blue or green eyes or red or blonde hair, a personal or family history of melanoma, a history of Xeroderma pigmentosum, or a history of exposure to psoralen and ultraviolet light.

The examiner also cited to research which concluded that a complex interrelationship occurs when over exposure to solar radiation is combined with other risk factors, such as the presence of atypical moles. In this regard, UV radiation may increase the number of acquired pigmented moles and induce atypical moles to develop melanoma. In regard to the Veteran, the examiner noted that he developed growing moles on his upper back after forced (due to the paucity of Army-issued clothing to wear) exposure to intense, prolonged, daily sunlight in Vietnam, for over a year. Furthermore, as noted above, he had no personal or family history of melanoma; he did not have fair skin or hair, or blue or green eyes; and he routinely avoided sun exposure and clothed himself to avoid its harmful effects. The Board also notes that there is no contradictory medical opinion of record. 

Based on the August 2011 medical opinion and the other evidence of record, the Board finds that the Veteran's metastatic melanoma is related to service and, as metastatic melanoma has been determined to be a contributory cause of the Veteran's death, service connection for the cause of the Veteran's death is in order. The claim is granted in full.


ORDER

Service connection for the cause of the Veteran's death is granted.



____________________________________________
MILO H. HAWLEY
Veterans Law Judge, Board of Veterans' Appeals



Department of Veterans Affairs